IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. HONIGSCHMIDT

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

ISAAC J. HONIGSCHMIDT, APPELLANT.

Filed August 1, 2023.   No. A-23-211.

Appeal from the District Court for Lancaster County: ANDREW R. JACOBSEN, Judge. Affirmed.

Sanford J. Pollack, of Pollack & Ball, L.L.C., for appellant.

Michael T. Hilgers, Attorney General, and Matthew Lewis for appellee.

RIEDMANN, BISHOP, and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Isaac J. Honigschmidt appeals from an order of the Lancaster County District Court denying his request to transfer his case to the juvenile court. Finding no abuse of discretion by the district court, we affirm.

## II. BACKGROUND

On November 16, 2022, the State filed an information charging Honigschmidt with aiding and abetting first degree murder, in violation of Neb. Rev. Stat. §§ 28-206 (Reissue 2016) and 28-303 (Cum. Supp. 2022), a Class IA felony. The information indicated that the event which gave rise to the charges occurred in October 2022. In October 2022, Honigschmidt was 16 years 4 months old. He was born in June 2006.

- 1 -

On November 28, 2022, Honigschmidt filed a motion to transfer the matter from district court to juvenile court pursuant to Neb. Rev. Stat. § 29-1816 (Cum. Supp. 2022). A juvenile transfer hearing was held on March 14, 2023. During this hearing, the State offered into evidence police reports which were related to Honigschmidt's charge; photographs taken during law enforcement's investigation; the autopsy report for the victim; a report regarding Honigschmidt's behavior at the juvenile detention facility after his arrest; and hospital records detailing Honigschmidt's suicide attempt in June 2022, approximately four months prior to the incident giving rise to his arrest.

The police reports indicate that on October 3, 2022, 15 year old Sallie Gilmer called 911 to report that she returned to her family's apartment after school and found her father, Jesse Gilmer, laying on the couch, unresponsive. Upon law enforcement's arrival, they observed multiple stab wounds to Jesse's chest, shoulder, and head. He was pronounced dead. A subsequent autopsy revealed that Jesse suffered from three stab wounds on his forehead, three stab wounds to his chest, and three stab wounds to his left shoulder and arm. There was also evidence of several blunt force trauma injuries. One of the stab wounds to Jesse's chest struck an artery which caused the loss of enough blood to prove fatal. At the time of his death, Jesse was 70 years old and had only one leg, his right leg having been previously amputated above the knee.

As a part of their investigation, law enforcement spoke to neighbors of the Gilmer family. One neighbor indicated that Sallie had a boyfriend, Honigschmidt, that Jesse did not like. In fact, Jesse was trying to keep the two apart. Law enforcement located both Sallie and Honigschmidt at the crime scene and brought them to the police station to be interviewed. During Honigschmidt's interview, he eventually confessed that when he drove Sallie home after school that day, he knew that she was planning to stab Jesse when she went inside. Honigschmidt indicated that Sallie had been planning to kill Jesse for "years," but he began working with Sallie to develop a more specific plan in the week prior to the murder. Honigschmidt explained that he wanted to help Sallie kill Jesse because fighting between Jesse and Sallie's mother was causing Sallie a great deal of stress and depression. Additionally, Honigschmidt stated that Jesse would not let Sallie spend time with him.

On October 3, 2022, after school, Honigschmidt and Sallie placed their cellular phones in airplane mode and then powered them off prior to leaving the school. They believed that by doing so, data from their cellular phones would make it appear that they were still at school at the time Jesse was murdered. Honigschmidt drove Sallie to her apartment, where she went inside with a knife that he had previously given to her for self-defense. Initially, Honigschmidt stayed in the car, but after a while, Honigschmidt left the car and approached the apartment to check on Sallie. Honigschmidt knew that Jesse was still alive at this point, because he heard Jesse yell at him to leave. Honigschmidt returned to his car, but went back to the apartment a few minutes later. At this point, he heard Jesse gasping for air. Honigschmidt and Sallie then left the apartment together and returned to the school, where they turned their cellular phones back on. Honigschmidt returned Sallie back to her apartment so that she could discover Jesse's body and call 911. Meanwhile, Honigschmidt drove to a nearby grocery store. Video obtained from the store by law enforcement showed that while there, Honigschmidt disposed of the bloody knife Sallie used to kill Jesse and a pair of gloves.

When law enforcement confronted Sallie with Honigschmidt's statement, she corroborated his version of events, admitting to stabbing Jesse multiple times while Honigschmidt waited in the car. Text messages exchanged between Sallie and Honigschmidt prior to the murder revealed their desire and plan to kill Jesse. In one message, Sallie informed Honigschmidt that she would receive $10,000 in life insurance proceeds if Jesse were to die. Honigschmidt responded, asking Sallie to split the money with him. A classmate of both Honigschmidt and Sallie told law enforcement that Honigschmidt hated Jesse and regularly made comments about wanting Jesse dead. The classmate opined that the murder was planned by Honigschmidt, rather than by Sallie. Honigschmidt denied encouraging Sallie to kill her father and indicated he only drove her to the apartment.

Honigschmidt has been receiving treatment from various mental health providers since 2016, when he was 10 years old. Just prior to beginning such treatment, Honigschmidt's father committed suicide in the family's home. Honigschmidt has been diagnosed as suffering from anxiety, depression, post-traumatic stress disorder, ADHD, and an adjustment disorder. He was prescribed medications for these conditions. Honigschmidt has twice been admitted for inpatient treatment due to suicidal ideations and actions, once in December 2021 and once in June 2022.

While receiving ongoing treatment for his mental health, Honigschmidt displayed multiple behavioral problems at school. In 2017 and 2018, when he was 11 and 12 years old, Honigschmidt physically assaulted other students on three separate occasions. In 2019, Honigschmidt threatened a teacher by telling her she was "close to death." Later in 2019, he used a pencil as a syringe and inserted it into his arm. Honigschmidt has also displayed disobedience, a lack of cooperation, insubordination, and harassing tendencies while at school.

Honigschmidt has not previously been charged or convicted with any crime, but he was contacted by police in December 2021 after sending nude pictures of his ex-girlfriend to multiple people. His ex-girlfriend was also concerned that Honigschmidt had performed a sexual act on her while she was sleeping and recorded the incident. After being contacted by police, she ultimately decided not to press charges. In June 2022, Honigschmidt was admitted for inpatient psychiatric treatment after he cut himself when his mother confronted him about sending inappropriate, sexual, pictures of himself to a family member and to her boyfriend's daughter. The medical records from this hospitalization reveal that Honigschmidt admitted to failing to take his medications and to feeling impulsive and aggressive. In fact, Honigschmidt's mother reported being afraid of him during certain periods due to his aggressive and destructive actions in their home. She told Honigschmidt's treating physician that he harmed himself, had played with fire, had learning and behavioral problems at school, and had sleep issues. Honigschmidt's mother also indicated that Honigschmidt had engaged in sexual activity with Sallie when his friends were in the next room.

After Honigschmidt was arrested for his involvement in Jesse's murder, he was lodged at the juvenile detention center in Lincoln. He has had multiple rules violations since being placed there, the most serious of which involve his repeated and continuous attempts to communicate with Sallie, who is also housed at the detention center, despite being ordered not to do so. During one such incident, Honigschmidt was physically aggressive with the staff when they told him to get away from a window from which he could see Sallie. Honigschmidt has also threatened another juvenile and has demonstrated a general disrespect for staff members and the rules. However, he has been actively participating in the educational program at the detention center and is described as a "steady and reliable student."

After the State rested, Honigschmidt offered the testimony of Dr. Stephanie Bruhn, a forensic clinical psychologist at the Lincoln Regional Center. Bruhn conducted a psychological evaluation of Honigschmidt on January 16, 2023. As a part of the evaluation, she interviewed him for an hour and a half at the detention center. Bruhn admitted that Honigschmidt was not "one hundred percent" honest with her during this interview regarding his continued communication with Sallie and his behavioral problems at the detention center. She indicated that such dishonesty could indicate that he was also dishonest when speaking with her about other topics.

In her report, Bruhn described Honigschmidt as a follower who has a desire to please others. He is impulsive and has trouble appropriately dealing with his anger and other emotions. Bruhn opined that Honigschmidt's relationship with Sallie had become unhealthy for him in that he was obsessed with her and could not separate from her despite being court-ordered to do so. Bruhn also opined that Honigschmidt had a relatively low likelihood of engaging in another violent crime upon his release. However, she indicated that such likelihood may increase if he were part of a group who was engaged in violence. She also admitted that in reaching this conclusion, she had assumed that Honigschmidt was not actively involved in Jesse's murder, as Honigschmidt declined to provide her with any details of the crime. Testing conducted by Bruhn revealed that Honigschmidt is

> conscientious, responsible, and mature for his age. Reportedly he is generally well-behaved, follows rules, and respects adults. [Honigschmidt] is likely to function well in a structured and predictable environment. Testing suggested he keeps his emotions in check on the surface but underneath his moods tend to be serious and sober. In general, [Honigschmidt] tends to conform to the expectations of others and may exhibit an overcontrol of his impulses and desires. He may anticipate criticism and be inclined to blame himself and engage in self-punishment. [Honigschmidt]'s results suggest he exhibits a controlled façade but underneath has marked feelings of inadequacy and insecurity. Due to his efforts to avoid mistakes, he is likely to restrict his activities to those that feel safe, familiar, and will lead to approval. The possible underlying self-doubt and low self-esteem may result in social withdrawal and a pattern of dependency on a supportive friend, adult, group, or institution. There may be times when he is unable to control his emotions and an anger outburst could occur.

Bruhn testified that Honigschmidt would benefit from rehabilitational programming, including mental health treatment which was focused on assisting him with managing his negative emotions, family therapy, and medication management. Bruhn believed that Honigschmidt would also benefit from assertiveness training so that he could learn how to not follow others so readily. She believed that all of these programs would be available to Honigschmidt in the community, in a youth group home, or in a foster home. However, the programs would also be available to Honigschmidt through the Nebraska Department of Corrections, should he remain in adult court.

Honigschmidt also called Beverly Hoagland to testify at the transfer hearing. Hoagland is the chief probation officer for juvenile probation in Lancaster County. She has never met Honigschmidt, but she did learn from juvenile court records that he has not previously been adjudicated in juvenile court nor has he ever been formally removed from his home. Hoagland

could not find any records which suggested that Honigschmidt has ever been in possession of a firearm or has ever been a member of a criminal street gang.

Hoagland testified that if Honigschmidt's criminal case was transferred to the juvenile court, he could be placed on juvenile probation. There are different levels of juvenile probation, ranging from community based resources, with a lower level of supervision, to community based intervention, with the highest level of supervision. As a part of juvenile probation, the juvenile court could order Honigschmidt to wear an electronic monitor, submit to established curfews, comply with no contact orders, and agree to not possess any sort of weapons. Honigschmidt would also be required to have "a full daily program," which would include, school, employment, therapy, and family support.

After the hearing, the district court entered an order overruling Honigschmidt's motion to transfer the case to juvenile court. The district court explained: "Having considered all the evidence in this case, the Court finds that there is sound basis [sic] for retaining jurisdiction in the District Court. It is the conclusion of the Court that jurisdiction should be retained by the District Court and the motion to transfer be denied." The details of the district court's consideration of the transfer factors contained in Neb. Rev. Stat. § 43-276 (Cum. Supp. 2022) will be provided in our analysis below.

Honigschmidt appeals the denial of his request to transfer the case to the juvenile court.

## III. ASSIGNMENT OF ERROR

Honigschmidt assigns as error that the district court abused its discretion in denying his motion to transfer the case to juvenile court.

## IV. STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## V. ANALYSIS

### 1. JURISDICTION

When a juvenile seeks to transfer a criminal case from adult court to juvenile court, § 29-1816(3)(c) provides that "[a]n order granting or denying transfer of the case from county or district court to juvenile court shall be considered a final order for the purposes of appeal." The statute further states that, upon entry of such an order, "any party may appeal to the Court of Appeals within ten days." On March 14, 2023, the district court entered an order denying Honigschmidt's motion to transfer his case to juvenile court, and Honigschmidt filed his notice of appeal on March 16; his appeal is timely.

### 2. MOTION TO TRANSFER TO JUVENILE COURT

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a

Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, Honigschmidt is charged with aiding and abetting first degree murder, a Class IA felony. As such, the charge against Honigschmidt puts him within this category of juvenile offenders.

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. For matters initiated in criminal court, a party can move to transfer to juvenile court pursuant to § 29-1816(3).

In the instant case, when Honigschmidt moved to transfer his case to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which subsection requires consideration of the following factors set forth in § 43-276:

> (a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim or juvenile agree to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court." See § 29-1816(3)(a). "[F]actors that are considered 'neutral' or 'not applicable' are equivalent to factors that favor transfer because § 43-276 starts with the presumption that the case should be transferred." *State v. Aldana Cardenas*, 314 Neb. 544, 561, 990 N.W.2d 915, 928 (2023). The classification of certain factors as "neutral," "not applicable," or "weighing in favor of transfer" are better described as factors that do not support a sound basis for retention. See *id*.

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, the court should employ "a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *State v. Stevens*, 290 Neb. 460, 465, 860 N.W.2d 717, 725 (2015). "In order to retain the proceedings, the court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less

weight is assigned to a specific factor." *Id.* "The burden of proving a sound basis for retention lies with the State." *Id.*

### 3. WAS DENIAL OF TRANSFER ABUSE OF DISCRETION?

In his brief on appeal, Honigschmidt alleges that the district court abused its discretion in the manner it analyzed the relevant statutory factors delineated in § 43-276(1). Honigschmidt believes that the district court's "findings were unsupported by evidence or misstated the evidence [and that the court] disregard[ed] factors weighing in favor of transfer, and fail[ed] to clearly state which factors it weighed either against or in favor of transfer." Brief for appellant at 10. To the contrary, the State contends that the district court carefully considered the evidence presented at the transfer hearing in light of the § 43-276 factors and that its decision to retain jurisdiction was supported by appropriate evidence. Ultimately, we agree with the State that the district court did not abuse its discretion in retaining jurisdiction over the case. In our analysis, we review the district court's analysis as to each statutory factor.

### (a) Factors Supporting Sound Basis for Retention

In its March 2023 order, the district court addressed each of the factors contained in § 43-276(1), but it did not specifically identify each factor as favoring retention or transfer. Nevertheless, we can surmise such from the context of the court's analysis of each factor whether the court found such factor to support or not support retention of the case in the district court. The following factors appear to have been found to favor retention in the district court.

Pursuant to § 43-276(1)(a), the type of treatment Honigschmidt would be amenable to, the district court found,

> It is clear that [Honigschmidt] is a seriously troubled young man who experienced significant trauma at a young age. Chief Probation Officer Hoagland testified as to the services that are available through the Lancaster County Juvenile Court, many of which are also available through adult probation services. Clearly [Honigschmidt] is in need of psychological therapy that may be of long duration and may require inpatient and closely supervised outpatient services.

Ultimately, the district court reasoned that while Honigschmidt could receive rehabilitative treatment in either a juvenile or an adult setting, that he will require treatment beyond his 19th birthday when the juvenile court's jurisdiction would end. We agree that such factor weighs in favor of retaining the case in the district court.

Under § 43-276(1)(b), whether the alleged offense included violence, the district court found, "The alleged offense is extremely violent." The court went on to summarize the evidence as follows:

> [Honigschmidt] is accused of helping to plan the murder of the victim. He provided the murder weapon and waited in the parking lot while [Sallie] stabbed her father to death. [Honigschmidt] stated that he got out of the vehicle and approached the residence of [Sallie's] father because he worried it was taking too long. [Honigschmidt] indicated that when he got to the front door, he could hear the victim gasping for air. The evidence showed that the homicide was planned and premeditated.

The district court concluded that this factor weighed in favor of retention. While Honigschmidt contends that there is no evidence that he directly committed a violent act, we agree with the district court that the evidence demonstrates that at minimum he planned and encouraged Sallie to commit the offense. Thus we agree that this factor supports retention in the district court.

Under § 43-276(1)(c), the motivation for the offense, the district court found that Honigschmidt appeared to have several motivations for committing the offense. First, he wished to improve Sallie's home life and make her happier. Second, he desired to continue his relationship with Sallie after the victim had prevented them from seeing each other. Finally, the court noted that there was evidence that Sallie and Honigschmidt stood to financially gain from the death of the victim. Ultimately, the district court concluded that this factor weighed in favor of retention. We find the evidence supports the district court's conclusion.

Under § 43-276(1)(d), the age of the juvenile offender and of others involved in the offense, the district court noted that Honigschmidt was 16 years, 3 months old at the time of the offense and his arrest. Sallie was 15 years old. The court indicated its concern that the juvenile court would have limited time to work with Honigschmidt before losing jurisdiction over him on his 19th birthday. Such concern indicates that the court found this factor to weigh in favor of retaining the case in the district court. We agree that this factor supports retention.

Under § 43-276(1)(f), the best interest of the juvenile, the district court found that an argument could be made that "it would be in the best interest of [Honigschmidt] not to have a felony conviction on his record." However, the court found that an argument could also be made that Honigschmidt's best interest required him to receive treatment and supervision for a period of time longer than the juvenile court would have jurisdiction over him. We read the court's order to conclude that this factor weighs in favor of retention. While we agree that an argument can be made that this factor would not favor retention, we note that Honigschmidt has been undergoing various forms of mental health treatment since he was ten. Yet his actions and behaviors have become increasingly aberrant, ultimately leading to extreme violence. Given the regression while under the care of mental health professionals, we agree that ultimately, it is in Honigschmidt's best interests to be part of a rehabilitative program not limited by the time frame remaining in juvenile court.

Under § 43-276(1)(g), consideration of public safety, the district court found,

As noted above, the incident here is extremely serious and involved causing the death of the victim. The evidence shows that [Honigschmidt]'s acts were premeditated and show a lack of empathy for the victim. Under these circumstances, [Honigschmidt] poses a serious risk to the public safety if he is in the community without intense supervision. It is likely that any such supervision or treatment would have to continue for a period longer than would be available under the juvenile justice system, particularly in view of [Honigschmidt]'s mental health issues.

We agree that this factor weighs in favor of retaining the case in the district court.

The district court found that § 43-276(1)(h), consideration of the juvenile offender's ability to appreciate the nature and seriousness of his conduct, also weighed in favor of retaining the case. The court explained, "This was a well planned and premedi[t]ated crime. [Honigschmidt]

participated in the planning and provided the knife which was used to kill the victim. He then took steps to conceal the crime and his participation."

Similarly, under § 43-276(1)(i), whether the best interests of the juvenile offender and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his minority, the court explicitly found, "The seriousness of the offense charged, and the evidence received at the transfer hearing indicate the need for supervision that will outlast his minority and the jurisdiction of the Juvenile Court." We agree that these factors weigh in favor of retaining the case in the district court.

### (b) Factors Not Supporting Sound Basis for Retention

The district court found § 43-247(1)(e), the previous history of the juvenile offender, to weigh in favor of transferring the case to juvenile court. The court noted that prior to committing the current offense, Honigschmidt had no previous criminal violations or involvement with the juvenile court. The district court further noted in its order that there was no evidence that Honigschmidt had been convicted or had acknowledged unauthorized use of a firearm under § 43-276(1)(l) or that he was a known or documented member of a street gang under § 43-276(1)(n). As such, the court appears to have found that these factors do not support a sound basis for retention in the district court. We agree with the district court's determination.

The district court also found in its order that there was no evidence presented regarding Honigschmidt's desire to participate in a restorative justice program, under § 43-276(1)(j); regarding the availability of a juvenile pretrial diversion program, under § 43-276(1)(k); or regarding whether a juvenile court order has been issued for the juvenile offender pursuant to § 43-2,106.03, under § 43-276(1)(m). The district court did not discuss § 43-276(1)(o), other matters relevant to the decision whether to transfer. None of these factors constitute a sound basis for retention. See *State v. Aldana Cardenas*, 314 Neb. 544, 990 N.W.2d 915 (2023).

### (c) No Abuse of Discretion

Although the district court's and our analysis of the factors under § 43-276(1) finds that 8 of 14 factors favor retaining the case, there is no arithmetical computation or formula required in a court's consideration of the statutory criteria or factors. *State v. Esai P.*, 28 Neb. App. 226, 942 N.W.2d 416 (2020). There are no weighted factors, that is, no prescribed method by which more or less weight is assigned to each factor specified by statute. *Id.* It is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile. *Id.* "This means that a trial court must balance a juvenile's amenability to complete rehabilitation by age 19 against the public's safety in the event that rehabilitation fails or requires more time than anticipated." *State v. Leroux*, 26 Neb. App. 76, 118, 916 N.W.2d 903, 929 (2018).

As we often state in our review of juvenile transfer cases, these are difficult decisions for the trial court and for this court on appeal because of the young age of the defendants. However, a young age by itself does not support a transfer to the juvenile court. See *State v. Esai P., supra* (setting forth cases of defendants as young as 14 or 15 years of age in which criminal proceedings were retained in district court because factors favoring public protection outweighed juvenile's

young age, such as involvement with gangs and guns, violent nature of crime, or unlikely success of rehabilitation before juvenile reaches age of majority).

In our review, we find the district court's rationale for denial of the motion to transfer was fully supported by the record. As noted by the district court, the serious and premeditated nature of the charged offense, Honigschmidt's age and need for prolonged supervision and treatment, and the safety and security of the public, all weighed heavily in favor of the district court retaining jurisdiction.

The evidence presented at the transfer hearing revealed that Honigschmidt assisted his 15 year old girlfriend in planning and carrying out the murder of her father. Honigschmidt actively participated in the murder of the victim by planning the specifics of the crime with Sallie, by providing Sallie with a knife, by driving Sallie to her family's apartment to carry out the crime, and by attempting to conceal their role in the crime, both by using their cellular phones to establish an alibi and by disposing of the knife Sallie used in the murder. Other evidence revealed that Honigschmidt approached the apartment after Sallie had stabbed her father multiple times. He admitted to law enforcement that at that point, the victim was still alive, as Honigschmidt could hear him gasping for air. Honigschmidt failed to intervene at that point to provide the victim with life-saving assistance. Moreover, Honigschmidt indicated to others that he wanted the victim dead so that Honigschmidt could continue his relationship with Sallie.

By the time of the transfer hearing in January 2023, Honigschmidt was 16 years, 7 months old. As such, if his case was transferred to the juvenile court, that court would lose jurisdiction over him in a little over 2 years, when he turns 19. The evidence presented at the hearing supported the district court's finding that Honigschmidt needed treatment and supervision beyond the period of time the juvenile court would have jurisdiction. Honigschmidt suffers from multiple mental illnesses and has been receiving therapy and taking medication off and on since 2016, when he was ten years old. Such longstanding treatment has clearly not alleviated his impulsivity or his issues with anger. Accordingly, there is a significant risk that another two years of treatment under the direction of the juvenile court will be insufficient to ameliorate Honigschmidt's condition to a point where the risk of further violent criminal behavior is nominal. The district court did not abuse its discretion in finding that Honigschmidt needs treatment beyond his 19th birthday.

While Honigschmidt does not have a criminal record, he does have a documented history of nonconforming, assaultive, and reckless actions both at school and at home. Such actions include harming other students, threatening teachers, sending nude photographs of girls to others, destroying property at home, and engaging in self-harm. His current charge of aiding and abetting murder represents a dramatic escalation to his prior behavior. The overwhelming evidence presented at the transfer hearing reveals that Honigschmidt poses a risk to the public if he is released without sufficient supervision and treatment. We agree with the district court that when balancing Honigschmidt's rehabilitative needs against the public's safety, that it is clear that Honigschmidt will require more time for supervision and treatment than is available to the juvenile court.

When a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said the court abused its discretion in refusing to transfer the case to juvenile court. *State v. Leroux*, 26 Neb. App. 76, 916 N.W.2d 903 (2018). Given the

evidence in this case, we cannot say the district court abused its discretion in finding that a sound basis for retaining the case in the district court exists.

## VI. CONCLUSION

Finding no abuse of discretion by the district court in its decision to retain jurisdiction over Honigschmidt, we affirm the district court's order denying Honigschmidt's motion to transfer the proceedings to juvenile court.

AFFIRMED.